UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY JOSEPH,<br><br>     Petitioner,<br><br><br>  - v. -<br><br>MICHAEL KIRKPATRICK, Superintendent<br>of Clinton Correctional Facility,<br><br>     Respondent. | **PETITION UNDER 28 U.S.C. § 2254**<br>**FOR WRIT OF HABEAS CORPUS**<br>**BY A PERSON IN STATE CUSTODY**<br><br>Docket No.:  9:18-cv-728 |

   Petitioner Jeffrey Joseph ("Petitioner" or "Joseph"), through his undersigned attorneys, respectfully submits his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is currently incarcerated in Clinton Correctional Facility.

   The issue here is whether a prosecutor can willfully and repeatedly disobey unambiguous instructions from a trial court judge to refrain from eliciting evidence of Petitioner's alleged gang affiliation as part of a transparent scheme to prejudice the accused. The state courts disagreed. Even under the highly deferential standard that governs this petition, the state courts' determination should be vacated and the petition granted.

<u>**Summary of the Case and Relevant Procedural History**</u>

   Petitioner, after a jury trial, was convicted of one count of manslaughter in the first degree. Petitioner was sentenced to a determinate prison term of twenty years to be followed by five years post-release supervision.

*The Murder and Investigation*

   Petitioner's conviction stemmed from the shooting death of Illis Bryan by a single gunshot wound on the evening of July 20, 2006 in the vicinity of East 95th Street and Clarkson

Avenue in Brooklyn, New York.  After the shooting, Bryan was taken in a van to the hospital where he eventually died during surgery. (119).[1] The cause of death was determined to be a single gunshot wound to the chest. (202-03, 206, 214).

Detective Michael Braithwait was assigned as the lead investigator. (461-62).  Detective Kevin Gasser arrived on the scene later that evening and canvassed for witnesses in various apartments in the vicinity of the shooting.  Detective Gasser obtained no information about the homicide at that time.  (38-39, 41).  Eventually, Detective Gasser interviewed two 911 callers, but no obtained no information concerning the homicide.  (48).

It appears that investigators received their first account of the homicide on or about September 7, 2006 when Detective Braithwait met Wilbur Calliste at the home of Mr. Calliste's grandmother.  (464-65).  Detective Braithwait took Calliste to the District Attorney's office where Calliste made a sworn statement that he was in the area of the shooting and heard shots, and was later told that it was person who went by the street name "Rookie" that had fired the shots. (358-65).

Approximately a year after the shooting, on April 6, 2007, Sean Rose, who was under arrest at the time, informed detectives that he had information regarding homicide. (H1.15).  Mr. Rose said that he witnessed a fight between Petitioner and another individual who went by name Rex, which was subsequently broken up by Rex's friend "Holkie" or "Hoakie."  (H1.15).  Rose stated that after the fight and as he walking into a nearby store, he saw Petitioner returning to the area. (H1.16).  Rose stated that he then heard gunshots, went outside at which point Bryan ran to

---

[1] Citations to the pages of the trial transcript are denoted without a prefix.  Citations to the pretrial hearing, dated May 3, 2010, are denoted with the prefix "H1."  Citations to the pretrial hearing, dated May 4, 2010, are denoted with the prefix "H2." Citations to the sentencing hearing are denoted with the prefix "S."

Rose and collapsed to the ground.  Rose identified Petitioner in a photo array.  (H1.16-17, 22).
Rose did not testify at trial.

On September 4, 2007, Kyle Leslie, while under arrest for marijuana possession, spoke
with police about the homicide.  (H2.3-4).  Leslie described a fight between Petitioner and
someone who went by Kevin in which Petitioner got beaten up.  (H2.4).  Leslie told police that
he then saw Petitioner return to the area and that Petitioner shot Bryan after Bryan had attempted
to punch Petitioner but failed to connect.  (H2.4-5).  Leslie identified Petitioner in a photo array.
(H2.8).  At trial, Leslie revealed that as of January of 2010, he had signed a cooperation
agreement with the US Attorneys Office in Pennsylvania that pertained to a federal indictment
for the sale and distribution of crack, which carried a possible prison sentence of 10 years to life.
(301, 306).

As of October 2, 2007 Joshua Byrd was in custody upon being arrested on four felony
counts arising out of a home invasion.  (129-30).  Byrd informed detectives that Petitioner, who
also went by the names "Jeff," "Cees" or "Cs" shot Bryan as the two were in the midst of a fight.
(H1.27).  Byrd identified Petitioner in a photo array.  (H1.30).  Although, as described below,
Byrd would only later enter into a formal cooperation agreement, he testified that he initiated the
discussions with the police in the hopes of helping himself with respect to the charges he was
being held on and other entanglements.  (129-30, 132-33).

On or about April 1, 2008, Petitioner was in police custody.  An undercover police officer
(the "UC") went into a small precinct cell next to Petitioner hoping to get Petitioner to implicate
himself in Bryan's death.  (425-29, 432-49).  Although the UC testified that he would often wear
a recording device while making narcotics purchases, in this instance he did not and Petitioner's
alleged statements to the UC were not recorded.  (452-56).  The UC wore a shirt stained with

ketchup to simulate blood and told Petitioner that he was in for stabbing his girlfriend and that she might die. (R.427, 432-33, 446). Later, according to the UC, Petitioner stated that he had "a body." (442). The UC would testify that eventually, Petitioner told him that he had been in a fight in a park, that Petitioner left and returned with a gun and "got into some words" with another individual who took a swing at Petitioner and missed. (445). Petitioner, according to the UC, stated that he pulled out his gun and shot the individual. (445).

On or about June 10, 2008, Petitioner was indicted on charges of murder in the second degree, manslaughter in the first degree, and criminal possession of a weapon in the second degree.

On February 23, 2009, Byrd identified Petitioner in a live "double blind" lineup, in which a detective (Detective Emil Thorovskiy) who was not familiar with the case accompanied Byrd when he made his identification. (468-69). On or about December 8, 2009, Byrd entered into a formal cooperation agreement with the Brooklyn District Attorney's office in connection with the home invasion arrests and several other arrests. (143-45, 169). In exchange for his testifying against Petitioner, Byrd would be eligible for as little as 1 to 3 years probation in addition to time served, thus avoiding a possible 25 year prison sentence. (146-47, 169). Although the cooperation agreement could be voided if Byrd participated in any additional criminal activity, by the time of trial, the prosecutor had not voided the agreement even though Byrd had been arrested several times for assaulting his child's mother a had violated orders of protection. (147-49, 156-59, 170, 182).

*The Trial Court Rejects The People's Motion To Be Permitted*
*To Elicit Evidence Of Petitioner's Alleged Gang Affiliation At Trial*

Prior to trial, the prosecutor sought to introduce evidence on his direct case of Petitioner's alleged "Crips" gang affiliation to show the witnesses' familiarity with him. (June 16, 2010 at 8-

9, 19-23).   The prosecutor nevertheless admitted that the incident was not a "gang-motivated homicide" and that gang affiliation was unrelated to Petitioner's alleged motive.  (*Id.* at 20-22). Petitioner's counsel objected, contending that the shooting was alleged to have arisen from a previous fight and gang affiliation was irrelevant, as even the prosecutor admitted.  (*Id.* 19-20). Petitioner's counsel added further that curative instructions would be ineffective at eliminating the prejudice given the notoriety of the "Crips" gang.  (*Id.* at 29).

The trial court judge agreed with Petitioner's counsel and determined that the homicide was not gang related and any gang affiliation was not relevant to the motive.  (*Id.* at 24).   The trial court judge also agreed that the accusations of gang affiliation would be highly prejudicial to Petitioner.  (*Id.* at 24, 32).  The next day, the trial court judge stated on the record:

> [A]lthough the victi[m] and the defendant may be Crip members, [there is] no evidence that the offense was due to gang affiliation. To the contrary, it appears that what occurred was personal between the defendant and the victim.   Whether they were different sects of the same gang is inconsequential without any indication . . . [that the charged crime] . . . resulted out of being in a gang. [June 17, 2010 at 3].

The court noted further, "the People conceded that motive was not a reason why" they sought to elicit gang affiliation and gang affiliation was not necessary for background.  (*Id.* at 3, 8-9).  The trial court judge reasoned that whether one is affiliated with a gang such as the Crips was a bad act, and, as such, its admissibility was governed by the New York Court of Appeals' decision in *People v. Molineux*, 168 N.Y. 264 (1901).  (*Id.* at 8-9).  The court reiterated that Petitioner's supposed "Crip" affiliation "had nothing do with this" and it was not necessary to show a sequence of events.  (*Id.*)  The court did permit the prosecutor to elicit that witnesses may have known Petitioner "from the neighborhood."  (*Id.* at 7-8, 13).  The court further permitted the prosecutor to elicit information that witnesses he would call were gang members so as to "take

the sting" out of any attempts to attack their credibility by Petitioner's counsel on cross-examination.

Notwithstanding the court's clear ruling and reasoning, after jury selection, the prosecutor renewed his request to elicit testimony regarding Petitioner's gang affiliation. (2). The court refused to change its ruling, reiterating that the prosecution's theory was that the shooting stemmed from a personal, not gang related matter. Specifically, the trial court judge stated that alleged gang affiliation "would take the focus away from the charges in this matter which are not really gang related." (3-4). The court stated further that: "it's not necessary to bring the inflammatory gang testimony in where it's not serving any real purpose whether it be more *Molineux* or a requirement as a narrative." (3-4). As demonstrated below, it is obvious that the prosecutor was determined to elicit testimony as to Petitioner's alleged gang affiliation regardless of the trial court judge's ruling.

*The Trial*

The trial commenced on June 21, 2010. In the morning session, the prosecution called the following witnesses: Sharon Bryan (the victim's mother), Police Officer Renee Diaz (one of the officers that initially arrived at the murder scene), Detective Gasser, and Sergeant Michael Sinatra (who collected evidence at the murder scene).

At the beginning of the afternoon session prior to Byrd taking the witness stand, the prosecutor again renewed his request to be able to elicit evidence of Petitioner's alleged gang affiliation. The prosecutor based his renewed application on the fact that Petitioner's "associates from the Crip street gang" had begun to "fill[]" the courtroom. (79). The prosecutor claimed that he observed the spectators using what he believed was "a particular handshake that the Crips typically use with one another" based on his three years experience as a gang prosecutor. (80).

The prosecutor inferred that the spectators were trying to intimidate Byrd from implicating Petitioner and that the jury should be made aware of his speculation. (81-82). Ultimately, the trial court judge denied the renewed application.

Initially, the prosecutor had Byrd identify himself as a member of the Crips, state his rank and describe his initiation. The prosecutor then, in defiance of the judge's earlier orders, attempted to elicit Petitioner's gang affiliation by asking Byrd:

Q.     Just wanted to point your attention to the people in the audience here.

MR. STUTMAN:     Objection.

Q.     Are they also Crips?

MR STUTMAN:     Objection.

THE COURT:     Sustained.

(91). The trial court judge did not give a curative instruction at that time. Shortly afterwards, the prosecutor again tried to elicit the same testimony:

Q.     Where were you waiting prior to your testimony here today?

A.     Where was I waiting?

Q.     Yes.

A.     In the room outside the hallway.

Q.     A conference room in the hallway?

A.     Yes.

Q.     Were you waiting there by yourself?

A.     Yes.

Q.     Did anybody approach that conference room?

MR. STUTMAN:     Objection.

THE COURT:        Sustained.

(91-92). Again the trial court judge did not give a curative instruction.  However, after ordering

the jury out, he warned spectators not to "fidget[]" or "mak[e] signs." (92-93).

Byrd then testified as to what he saw on July 20, 2006.  Specifically, at some point,

Bryan told Byrd that he wanted to beat up "C's" because C's had waved a gun in the park. (102-

03, 174-5).  The court instructed the jury that the contents of Bryan's statement was not being

offered for the truth, but just as a narrative to show why certain actions may have ben taken.

(103-04).  Approximately seven minutes later, Byrd began walking towards Kings Highway (or

away from the area of the eventual shooting) and observed "C's" walking in the opposite

direction. (105-08).  Byrd admitted he did not see "C's" with a weapon at that point. (106-07).

Byrd testified that about three minutes later, he changed direction and went back towards

Clarkson Avenue where he observed C's calling for "Holkie." (109-10).  Byrd recalled that

there were about fourteen people in the area.  (110-16, 175-76).  Byrd recalled that C's was

eventually approached by Bryan, who yelled at C's. (112-14, 176).  Byrd then testified that he

saw Bryan take a swing at "C's", but missed and stumbled forward. (113-15).  Byrd stated that

C's pulled a gun out of waste and fired a shot at Bryan, who was about four feet away.  (112).

Bryan later admitted that he did not actually see the shot, but "kn[e]w" where it came from.

(177).  Byrd stated that he witnessed Bryan staggering around until he ultimately collapsed.

(119, 122-23).

As indicated above, Byrd admitted that he entered into a cooperation agreement that

helped him avoid a potentially lengthy prison sentence arising out of a home invasion.  He

similarly admitted to a long criminal record, which included domestic violence charges and

violations of at least three orders of protection.

Kyle Leslie testified after Byrd. Leslie initially testified that he observed Petitioner and an individual who went by the name of "Kev" get in an argument after which a fight ensued in which "Holkie" eventually intervened. (248-51). Leslie then testified that he did not see Petitioner return to the area. (255). At this point, the prosecutor again attempted to elicit testimony concerning Petitioner's alleged gang affiliation (or that the spectators were gang members and therefore Petitioner was a gang member):

Q.      Do you recognize anybody in the audience.

A.      Yeah.

....

Q.      Members of the audience members of the Crips?

MR. STUTMAN:      Objection.

THE COURT:      Sustained.

Q.      How do you feel about testifying here today?

MR. STUTMAN:      Objection

THE COURT:      Overruled.

A.      This is – this not something I want to do, man.

Q.      Are you uncomfortable?

A.      Yeah.

MR. STUTMAN:      Objection.

THE COURT:      Sustained.

Q.      How come you don't want to testify?

MR. STUTMAN:      Objection.

THE COURT:      Overruled – sustained.

(256). Shortly after this exchange, the court held an off-the-record bench conference with counsel. The court granted the prosecutor's application to have an *ex parte* conference with Leslie pursuant to New York case law to determine whether Leslie was being intimidated. (269-71). Ultimately, the court granted the prosecutor's request to treat Leslie as a hostile witness based on the inconsistency between his testimony and his prior statement to the police. (297-98). At that point, Leslie admitted that in his prior statements to authorities where he implicated Petitioner as the shooter. Leslie claimed, however, that detectives were "bugging me about the case" and that he told them "what they wanted to hear." (304, 313). At the close of his direct examination of Leslie, the prosecutor again attempted to elicit testimony as to Petitioner's alleged gang affiliation:

> Q.     And now in this courtroom in the presence of a whole bunch of Crips –
>
> MR. STUTMAN:    Objection.
>
> THE COURT:    Sustained. Sustained. That's stricken. Disregard it.
>
> MR. GLASSER:    I have nothing further, Judge. (300-01).

Wilber Calliste testified after Leslie. Calliste was incarcerated in Pennsylvania on a drug conviction and still needed to serve an additional three years. (321-22, 339-44). He denied receiving any type of benefit in exchange for his testimony, although he admitted he was not prosecuted for possession of a loaded weapon in his house. (322-23, 345-47). He testified that he witnessed an argument between Petitioner and another individual prior to the shooting. Consistent with his prior statement to authorities, he testified that he later heard shots when he was inside an adjacent, but did not see the actual shooting. (337-38, 356). He admitted that he was drinking and smoking marijuana at the time of the shooting. (350).

Following Calliste's testimony, the prosecution called Detective Tkhorvskiy to the stand to describe the double blind lineup discussed above.   The prosecutor asked Detective Tkhorovskiy whether he knew the "nature of the case." (378).  Detective Thorvskiy replied that "I knew it was probably a gang case, originated in the gang bureau." (378).  The court stated, "stricken." (378).

Afterwards, Detective Anderone testified as to Petitioner being given his Miranda rights. (384-94).  Then, UC testified as to his conversations with Petitioner while he was in custody. Detective Braithwaite then testified as to the lineup procedure in which Byrd identified Petitioner.  The People then rested their case.  Petitioner called no witnesses.

When the proceedings resumed, Petitioner's counsel moved for a mistrial based on the prosecutor's repeated references to Petitioner's alleged gang membership. (514-15).  Counsel explained that while the court sustained his objections and at times made curative instructions, the prosecutor's disobedience of the court's clear instructions not to do so was too prejudicial for any curative instruction to be effective.  The court denied the motion, commenting that the curative instructions were sufficient and that Petitioner's counsel should have made an application sooner, but instead waited until he could see how the People's case would proceed. (516-17).

The jury found Petitioner guilty of one count of manslaughter in the first degree.  The jury acquitted Petitioner of one count of murder in the second degree and one count of criminal possession of a weapon in the second degree. (658-59).  The court sentenced Petitioner to twenty years incarceration followed by five years post-release supervision. (S.7-8).

*Petitioner's Appeal*

Petitioner filed a timely appeal to the New York Appellate Division – Second Department (the "Second Department"). Petitioner's counsel raised three issues on appeal: (i) that he was denied his right to due process based on the prosecutor's repeated flouting of the trial court's order not to elicit evidence of Petitioner's alleged gang affiliation; (ii) that the photo array and lineup used to identify Petitioner were unduly suggestive; and (iii) that Petitioner was denied his right to a meaningful trial by jury by virtue of the trial court's failure to give an instruction as to a lesser included offense of second degree manslaughter. Through *pro se* supplemental briefing, Petitioner raised the additional argument that the trial court did not give a proper read back of testimony to the jury during deliberations and that his trial counsel was ineffective for not requesting a "*Sirois* hearing" based on Leslie's change in testimony.

By decision dated December 21, 2016, the Second Department rejected Petitioner's appeal in full. *See People v. Joseph*, 145 A.D.3d 916 (N.Y. App. 2016). As relevant to the issue raised on this petition, the court held: "The prosecutor's questions and comments, even if improper, were not so egregious as to have deprived the defendant of a fair trial. Any prejudice resulting from the prosecutor's reference to the defendant's gang membership was alleviated by the Supreme Court's curative instruction."

Petitioner filed a timely application for leave to appeal to the New York Court of Appeals, which was denied on March 27, 2017. *See* 76 N.E.3d 1083 (N.Y. 2017).

At this time, no other petition or appeal on Petitioner's behalf is pending in any court as to the judgment that is be challenged in this case. The Petitioner is serving no other sentences and has no other sentences to serve.

At trial, Petitioner was represented by Alan I. Stutman, 50 Court Street, Brooklyn, New York 11242. On his appeal to the Third Department, Petitioner was represented by Seymour W. James, Legal Aid Society, Criminal Appeals Bureau, 199 Water Street, New York, New York 10038. On information and belief, Petitioner's application for leave to appeal to the New York Court of Appeals was done on a *pro se* basis.

## This Petition Is Timely Filed

This Petition is timely because it was filed within one year after the expiration of the amount of time to seek writ of certiorari from the United States Supreme Court. *Fernandez v. Artuz*, 402 F.3d 111, 112 (2d Cir. 2005). In addition, the tolling provision of 28 U.S.C. § 2244(d)(2), which provides: "The time during which a properly filed application for State post-conviction or other collateral view with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." *See also Holland v. Florida*, 130 S. Ct. 2549, 2555 (2010) (noting that subsequent application for post-conviction relief in state court following United States Supreme Court's denial of certiorari stayed AEDPA one year limitations period).

Here, as noted above, the New York Court of Appeals denied Petitioner's application for leave to appeal on March 27, 2017, which gave Petitioner until June 26, 2017 (accounting for the ninetieth day falling on a Sunday) to seek a writ of certiorari from the United States Supreme Court. Accordingly, this Petition is timely filed as it has been filed before June 26, 2018.

## Grounds For Petition

*Violation of Petitioner's Rights to Due Process Based on the Prosecutor's Repeated Disobedience of the Trial Court Judge's Order to Not Elicit Testimony Regarding Petitioner's Alleged Gang Affiliation*

Petitioner contends that his right to due process under the Fourteenth Amendment to the United States Constitution was violated by virtue of prosecutorial misconduct that includes the

prosecutor's repeated attempts to elicit testimony regarding Petitioner's supposed gang affiliation.

Petitioner's state court conviction is reviewed under the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   Under AEDPA, a habeas petitioner must demonstrate that the decision of state appellate court was either "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Clearly established federal law for AEDPA purposes is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  As the Second Department did not identify an incorrect legal standard when assessing Petitioner's claim of prosecutorial misconduct, the inquiry here is whether it "unreasonably appli[ed] it to the facts of the particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 405, 407 (2000).  The state court, however, need not be presented with an "'identical factual pattern before a legal rule must be applied.'"  *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)).   The state court's application must be "objectively unreasonable, [and] not merely wrong." *Woodall*, 134 S. Ct. at 1702 (internal quotation and citation omitted).   Nevertheless, "the increment of incorrectness beyond error need not be great; otherwise, *habeas* relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Jackson v. Conway*, 763 F.3d 115, 135 n.19 (2d Cir. 2014) (quoting *Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011)).

The Supreme Court has long held that a prosecutor's improper comments during trial can constitute a denial of due process if they "'so infected the trial with unfairness as to make the

resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The Court recently confirmed that *Darden* is "clearly established" federal law for purposes of AEDPA. *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012).

While Petitioner has not located a case with facts substantially similar to those at issue here, and otherwise recognizes that AEDPA sets a very high bar, it is respectfully submitted that to deny habeas relief here would essentially result in a rule that a trial judge's clear pretrial instructions to the prosecution are without any real meaning. Specifically, this is not a situation where a prosecutor merely disregards or misconstrues rules of evidence on a momentary basis. Rather, the prosecutor here, from the outset, sought to paint Petitioner as a gang member even though the prosecutor admitted that there was no evidence that the homicide was gang related. Indeed, under the prosecution's own theory of the case, the homicide was not gang related.

Prior to trial, the trial court judge denied the prosecutor's motion *in limine* to introduce such evidence. And, in fact, prior to the afternoon session of the first day of trial, when the first alleged eyewitness of the shooting was set to testify, the prosecutor again moved to be allowed to elicit testimony regarding Petitioner's supposed gang affiliation, which the trial court again denied. Undeterred by the trial court's clear mandate, shortly after his examination of Joshua Byrd had begun, the prosecutor proceeded to ask him if spectators who appeared to be associated with Petitioner were "also Crips." Thus, almost immediately, the prosecutor created the impression he hoped to, making a nullity and mockery of the court's prior two orders to not do so.

Indeed, the prosecutor continued with this line of questioning during his direct examination of Kyle Leslie, bringing his attention to courtroom spectators who the prosecutor

characterized as Crips.  In fact, the prosecutor was so intent on leaving the jurors with the impression that Petitioner was a gang member and that they should infer guilt on that basis that he concluded his direct examination of Leslie by stating that he was giving his testimony "in this courtroom in the presence of a whole bunch of Crips."

As the foregoing demonstrates, this is not a case where a prosecutor makes stray improper comments during, for example, summation, where the jury is generally instructed that the prosecutor's comments constitute argument. *Cf., Jackson v. Conway*, 763 F.3d 115, 149-50 (2d Cir. 2014) Rather, the prosecutor had an obvious strategy to introduce what he knew to be irrelevant character evidence.  The judge instructed him not to pursue this strategy at the outset, but he persisted on doing so nonetheless.  While the judge gave curative instructions following some of the prosecutor's improper questions, it is respectfully submitted that any such instructions were insufficient to clear the taint that the prosecutor clearly sought to create.  *See Gongora v. Thaler*, 710 F.3d 267, 278 (5th Cir. 2013) (prosecutor's repeated references to defendant's failure to testify despite trial judge's warnings and curative instructions warranted grant of habeas petition).  Indeed, what purpose could the judge's denial of the prosecutor's motion *in limine* have served, *i.e.* that jurors were not to be made aware of Petitioner's alleged gang ties, if the prosecutor could subsequently and repeatedly ask questions designed to elicit the very same and highly prejudicial evidence?

Nor was the evidence against Petitioner overwhelming.  Every single witness that placed Petitioner at the scene that so testified at trial did so under some sort of cooperation agreement with the authorities, and one admitted to be under the influence of drugs and alcohol at the time. Indeed, the prosecution's star witness, Joshua Byrd had a lengthy criminal record and received very favorable treatment on charges related to a very serious home invasion robbery.  Mr. Byrd

16

also appears to have had a serious history of domestic violence.  And while an undercover officer claimed that he heard Petitioner confess to the murder, he did not capture these statements using a recording device, which he admitted was his usual practice.  Indeed, had the prosecutor himself felt the evidence was overwhelming, he would not have felt the need to repeatedly elicit evidence the judge instructed him not to.

### Conclusion

For all of the foregoing reasons, petitioner Jeffrey Joseph respectfully requests that the Court grant a writ of habeas corpus.

Dated: June 21, 2018

FRANZBLAU DRATCH, P.C.

/s/ Stephen N. Dratch
Stephen N. Dratch
233 Broadway, Suite 1800
New York, NY 10279
(212) 571-1808
*Attorneys for Petitioner*